IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Newport News Division

UNITED STATES OF AMERICA,

        v.                                Criminal No. 4:20cr20 (DJN)

SHAKERA S. GREENE,
      Defendant.

## MEMORANDUM OPINION
### (Denying Motion for Compassionate Release)

On July 28, 2020, in accordance with the terms of a written Plea Agreement filed on July 16, 2020, Defendant Shakera Semone Greene ("Defendant") pled guilty to a lesser included offense of Count One of the Indictment:  Conspiracy to Possess with Intent to Distribute Less Than Five Hundred (500) Grams of Cocaine, Less Than Twenty-Eight (28) Grams of Cocaine Base, Less Than One Hundred (100) Grams of Heroin, and Forty (40) Grams or More of Fentanyl, in violation of 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C). On February 19, 2021, the undersigned sentenced Defendant to forty-two months' imprisonment with five years' supervised release.

This matter now comes before the Court on Defendant's Motion for Compassionate Release (Mot. for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) with Memorandum of Law ("Def.'s Mem.") (ECF No. 103)), which moves pursuant to 18 U.S.C. § 3582(c)(1)(A) for Defendant's release in light of her medical conditions and the outbreak of Coronavirus Disease 2019 ("COVID-19").  For the reasons set forth below, the Court hereby DENIES Defendant's Motion (ECF No. 103).

# I.   BACKGROUND

## A.   Defendant's Underlying Offense

Beginning in August 2017 and continuing through March 2020, Defendant engaged in a drug trafficking conspiracy to possess and distribute cocaine, cocaine base, heroin, and fentanyl. (June 28, 2021, Presentence Investigation Report ("PSR") ¶¶ 1, 7.1 (ECF No. 99).)  Defendant's co-conspirator, Dontae Rashawn Parks ("Parks") — with whom Defendant cohabited — initiated the conspiracy in April 2017.  (PSR ¶ 7.3.)  When Parks was arrested and placed in custody in August 2017, Defendant transitioned from being merely complicit in the drug trafficking business to having a more active role.  (PSR ¶ 7.3.)  On October 11, 2017, Defendant distributed fifty-six grams of cocaine during a controlled buy.  (PSR ¶ 11.)  Following Parks's release in November 2017, Defendant continued to reside with Parks and facilitate his drug distribution activities.  (PSR ¶ 13.)

## B.   Procedural History

During a Plea Agreement Hearing on July 28, 2020, Defendant pled guilty to Count One of the Indictment, Conspiracy to Possess with Intent to Distribute Less Than Five Hundred (500) Grams of Cocaine, Less Than Twenty-Eight (28) Grams of Cocaine Base, Less Than One Hundred (100) Grams of Heroin and Less Than Forty (40) Grams or More of Fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(C), pursuant to the terms of a written Plea Agreement filed on July 16, 2020.  (ECF Nos. 45, 56.)  In total, according to the PSR, Defendant was accountable for 615.1524 grams of cocaine, 1.8500 grams of cocaine base, 10.5600 grams of heroin, 70.9090 grams of fentanyl and 4.8160 grams of marijuana, resulting in a base offense level of 24.  (PSR ¶ 19.)  The Government then filed a Motion to Grant an Additional One-Level Reduction in the Offense Level for Acceptance of Responsibility on February 5, 2021.  (ECF No.

78.)  The PSR already reflected this additional one-level reduction (PSR ¶ 36), resulting in a total offense level of 23 (PSR ¶ 37).  On February 19, 2021, the undersigned sentenced Defendant to forty-two months' imprisonment and five years' supervised release.  (ECF No. 84.)

### C.    Defendant's Motion for Compassionate Release

Before Defendant began serving her term of imprisonment, COVID-19 began to spread in the United States, including within the federal prison system. *See COVID-19 Coronavirus*, Fed. Bureau of Prisons (showing updated figures on the number of inmates and prison staff who have tested positive for COVID-19).[1] In response, on June 25, 2021, Defendant moved for compassionate release pursuant to § 3582(c)(1)(A).  (Def.'s Mot. at 1.)

In support of her Motion, Defendant argues for early release, because her medical conditions render her particularly susceptible to COVID-19.  (Def.'s Mot. at 1-2.)  Specifically, Defendant asserts that her asthma and "very nearly morbid obesity" render her more likely to be hospitalized, require a ventilator to breathe, or die as a result of contracting the virus.  (Def.'s Mot. at 1-2.)  Defendant — a Black female — further argues that she requires additional protection against the disease, as the Centers for Disease Control and Prevention ("CDC") have recognized that Black individuals are twice as likely to die from COVID-19-related illness as White individuals.  (Def.'s Mot. at 10-11.)  Defendant also contends that she has a particularized risk of contracting COVID-19, because the virus has been spreading rapidly through Bureau of Prisons ("BOP") facilities — including FCI Tallahassee, where Defendant is housed.  (Def.'s Mot. at 2.)  Although there were no active inmate infections at the facility at the time that Defendant filed her Motion, the infection rate among inmates had previously grown to roughly fifty percent.  (Def.'s Mot. at 15.)

---

[1]        Available at https://www.bop.gov/coronavirus/ (last visited Nov. 22, 2021).

Defendant further asserts that her release comports with the relevant § 3553(a) factors and policy statements, because she poses no danger to the community and is unlikely to recidivate. (Def.'s Mot. at 2.) Defendant avers that her involvement in the instant offense was attributable to her relationship with Parks and notes that her only other criminal history involves minor traffic offenses related to licensure and failures to appear. (Def.'s Mot. at 23.) Finally, Defendant contends that she has a viable release plan. (Def.'s Mot. at 24.) If released, Defendant plans to live with her mother in Newport News, continue raising her children and resume her work as a certified nursing assistant. (Def.'s Mot. at 24.)

The Government filed its Response to Defendant's Motion on August 9, 2021. (United States' Resp. in Opp'n to Def.'s Mot. for Compassionate Release ("Gov't Resp.") (ECF No. 110.)) Defendant filed her Reply in Support of Motion for Compassionate Release on August 16, 2021 (Def. Reply in Supp. of Mot. for Compassionate Release ("Def.'s Reply") (ECF No. 111)), rendering this matter now ripe for review.

## II.    STANDARD OF REVIEW

As amended by the First Step Act, 18 U.S.C. § 3582(c)(1)(A) authorizes courts to modify a criminal defendant's sentence for "extraordinary and compelling reasons" "upon motion of the Director of the Bureau of Prisons" or "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i). By its plain language, § 3582(c)(1)(A) requires defendants to first exhaust administrative remedies or wait thirty days after requesting that the warden of their facility file a motion for a sentence reduction; however, courts have waived this requirement when enforcing it would prove futile. *See, e.g.,*

*Washington v. BOP*, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (explaining in addressing motion for recalculation of good time credit under First Step Act that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile").

Once the administrative remedies under § 3582(c)(1)(A) have been exhausted or waived, the Court may reduce or modify a sentence when "extraordinary and compelling reasons warrant such a reduction." In determining what constitutes "extraordinary and compelling reasons," courts have considered related policy statements under the United States Sentencing Guidelines, though such statements are not binding. *See, e.g.*, *United States v. Beck*, 425 F. Supp. 3d 573, 582 (M.D.N.C. 2019) (considering what the Sentencing Guidelines defined as "extraordinary and compelling reasons"). These policy statements provide that a defendant's medical conditions, age, family circumstances or other circumstances, either singly or in combination, can prove sufficiently extraordinary and compelling to justify compassionate release. U.S.S.G. § 1B1.13, application notes 1(A)-(D).

However, to be extraordinary and compelling, a defendant's medical conditions must be either "terminal . . . with an end of life trajectory" or must "substantially diminish[ ] the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, application note 1(A). Similarly, a defendant may be released based on his or her advanced age when he or she "is at least 65 years old," "is experiencing a serious deterioration in physical or mental health because of the aging process" and "has served at least 10 years or 75 percent of his or her term of imprisonment." § 1B1.13, application note 1(B). Defendants may also seek compassionate release based on family circumstances, including when the caregiver of a defendant's minor child has died or

become incapacitated, or when the defendant's spouse or partner has become incapacitated and the defendant constitutes the only available caregiver. § 1B1.13, application note 1(C). Finally, the Sentencing Guidelines contemplate situations in which "there exists in the defendant's case an extraordinary and compelling reason [for compassionate release] other than, or in combination with, [the defendant's medical conditions, age and family circumstances]." § 1B1.13, application note 1 (D).

Relevant here, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. Feiling (Feiling I)*, 453 F. Supp. 3d 832, 841 (E.D. Va. 2020) (citing *United States v. Dungee*, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020)); *United States v. Edwards*, 451 F. Supp. 3d 562, 568 (W.D. Va. Apr. 2, 2020)). "To establish a particularized risk of contracting COVID-19, an inmate must first demonstrate that cases of COVID-19 have emerged at his facility." *United States v. Feiling (Feiling II)*, 2020 WL 5047064, at *7 (E.D. Va. Aug. 26, 2020). However, even then, "COVID-19 and an inmate's susceptibility to it do not justify compassionate release when . . . the inmate refuses additional protections afforded to him by the BOP without good cause and continues to voluntarily place himself in an environment in which he faces the highest risk of contracting the disease." *Id.*

Even if extraordinary and compelling reasons exist for a defendant's compassionate release, § 3582(c)(1)(A) requires courts to consider "the factors set forth in section 3553(a) to the extent they are applicable" and "applicable policy statements issued by the [United States] Sentencing Commission" before granting a sentence modification. To that end, § 3553(a) requires courts to consider, among other factors, the nature and circumstances of the underlying

offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(1)-(2). Additionally, the Sentencing Commission has advised courts to consider whether, based on the factors set forth in 18 U.S.C. § 3142(g), a defendant would present a danger to the safety of any other person or the community if released.[2]  U.S.S.G. § 1B1.13(2). And the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated, alone, proves insufficient to warrant a sentence reduction.  § 1B1.13, application note 3.

Ultimately, the Court may grant compassionate release only after a defendant establishes an extraordinary and compelling reason for his or her release and the Court finds that the defendant's release would not undermine the relevant § 3553(a) factors or any relevant policy statements issued by the Sentencing Commission.

### III.    ANALYSIS

### A.    Defendant Does Not Demonstrate Extraordinary and Compelling Reasons That Would Entitle Her to Compassionate Release.

To succeed on her Motion, Defendant must show that her circumstances present "extraordinary and compelling reasons" entitling her to compassionate release.  Accordingly,

---

[2]    As modified in the context of a compassionate release motion, before releasing a defendant, courts should consider:  (1) the nature and circumstances of the offense of conviction, including whether the offense is a crime of violence, a violation of § 1591, a terrorism offense, or an offense involving a minor victim, controlled substance, firearm, explosive or destructive device; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including his or her character, physical or mental condition, family and community ties, financial resources, history of substance abuse and criminal history, as well as whether at the time of the instant offense, the defendant was on a period of probation, parole or other form of release; and, (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g)(1)-(4).

Defendant argues that her health conditions, in addition to the heightened risk of contracting COVID-19 while in confinement, increase her susceptibility to the virus. (Def.'s Mot. at 6.) Defendant contends that her asthma and obesity — combined with her substance use disorder diagnosis, her sickle cell trait carrier status and her history of smoking — put her at increased risk of severe COVID-19-related illness or death. (Def.'s Mot. at 10.) Defendant further asserts that her race enhances her need for protection, as Black individuals are more likely to die or be hospitalized due to COVID-19 than White individuals. (Def.'s Mot. at 10-11.) Finally, Defendant insists that BOP conditions exacerbate the risk posed by COVID-19, as the virus has been shown to spread rapidly in BOP facilities, including FCI Tallahassee. (Def.'s Mot. at 15-16.)

In response to Defendant's Motion, the Government argues that Defendant has failed to establish extraordinary and compelling reasons for her release. (Gov't Resp. at 8.) Namely, the Government asserts that Defendant has shown neither a particularized susceptibility to COVID-19, nor a heightened risk of contracting the disease at FCI Tallahassee. (Gov't Resp. at 11, 15.) The Government acknowledges that asthma and obesity may increase one's chances of suffering severe illness from COVID-19, and that the pandemic has disproportionately impacted Black communities. (Gov't Resp. at 11, 13.) However, the Government argues that race alone is insufficient to establish a particularized susceptibility to the disease and further notes that Defendant's refusal of the COVID-19 vaccine undermines her assertion that extraordinary and compelling reasons entitling her to compassionate release exist. (Gov't Resp. at 15, 11.) The Government additionally posits that the BOP is capable of managing Defendant's health conditions in prison and, in fact, did so when Defendant previously tested positive for COVID-19 while in custody. (Gov't Resp. at 12-13.)

8

Moreover, the Government argues that Defendant has failed to show that she has a heightened risk of contracting COVID-19 at FCI Tallahassee. (Gov't Resp. at 15.)  At the time of the Government's response, FCI Tallahassee had reported only eight active cases of COVID-19 among an inmate population of 867, and zero cases among staff members. (Gov't Resp. at 16.)  The Government further emphasizes that COVID-19 numbers are declining at the facility, while vaccination rates among inmates and staff continue to climb. (Gov't Resp. at 16.)  Relatedly, the Government notes that BOP offered the Moderna vaccine to Defendant, but she refused it. (Gov't Resp. at 17.)  The Government thus asserts that BOP has taken steps to reduce the risk of COVID-19-related illness within FCI Tallahassee, but by refusing the vaccine, Defendant undermines her argument that the facility has made insufficient efforts to mitigate the risk. (Gov't Resp. at 17-18.)

Finally, the Government argues that Defendant's release would not provide a safer alternative to incarceration. (Gov't Resp. at 18-19.)  If released, Defendant plans to live with her mother and children while resuming her work in the healthcare field. (Gov't Resp. at 18-19.)  The Government argues that this release plan would pose a heightened risk of exposure to Defendant, her family members and the community at large. (Gov't Resp. at 19.)

As a threshold matter, neither party contends that Defendant has failed to exhaust her administrative remedies under § 3582(a)(1)(A).  Defendant states that she submitted a request for compassionate release to the FCI Tallahassee warden via counsel on July 1, 2021, as well as her own request on July 14, 2021. (Def.'s Mot. at 4.)  Defendant then filed her Motion for Compassionate Release on July 23, 2021. (Def.'s Mot. at 27.)  Though Defendant did not satisfy the thirty-day waiting period under § 3582(a)(1)(A), the Court finds that Defendant did exhaust her administrative remedies before filing her Motion, as the FCI Tallahassee warden denied the

9

counsel-submitted request on July 19, 2021, which constitutes administrative exhaustion. (Gov't

Resp. Ex. A at 1 (ECF No. 110-1)); *see Murphy v. United States*, 2021 WL 3177409, at *3 (E.D.

Va. July 27, 2021) (finding that the defendant had exhausted his administrative remedies when

the warden denied his request for compassionate release eight days after the defendant submitted

his request). Therefore, the Court has jurisdiction to consider the merits of Defendant's Motion.

     The Court accordingly finds that Defendant has not established an extraordinary and

compelling reason for her release. As mentioned, "[i]n the context of the COVID-19 outbreak,

courts have found extraordinary and compelling reasons for compassionate release when an

inmate shows both a particularized susceptibility to the disease and a particularized risk of

contracting the disease at his prison facility." *Feiling I*, 453 F. Supp. 3d at 841 (citations

omitted). To establish a particularized susceptibility to COVID-19, courts have required

defendants to provide evidence that they suffer from a medical condition identified by the CDC

as a COVID-19 risk factor. *See, e.g., United States v. Beahm*, 2020 WL 4514590, at *2 (E.D.

Va. Aug. 5, 2020) (finding the defendant particularly susceptible to COVID-19, because the

defendant suffered from type II diabetes, which the CDC has identified as a COVID-19 risk

factor); *United States v. White*, 2020 WL 3442171, at *5 (E.D. Va. June 23, 2020) (finding that

the defendant did not have a particularized susceptibility to COVID-19 despite suffering from

several medical conditions identified as COVID-19 risk factors). Indeed, a general fear of

contracting COVID-19, without a sufficient basis for that fear, does not provide an extraordinary

and compelling reason for a defendant's release. *See United States v. Raia*, 954 F.3d 594, 597

(3d Cir. 2020) ("[T]he mere existence of COVID-19 in society . . . cannot independently justify

compassionate release."); *Feiling I*, 453 F. Supp. 3d at 841 ("Notably, 'the *fear* of contracting a

communicable disease' proves insufficient to justify a sentence modification." (quoting *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (emphasis added))).

Consistent with these principles, courts have found that asthma and obesity, particularly when combined with other health conditions, can establish a particularized susceptibility to COVID-19. *See, e.g.*, *United States v. Campbell*, 2020 WL 7630705, at *3 (W.D. Va. Dec. 22, 2020) (finding that defendant with obesity, hypertension and severe asthma satisfied the particular susceptibility requirement); *Gilson v. United States*, 2020 WL 5834416, at *3 (E.D. Va. Sept. 30, 2020) (finding the same for a defendant with type II diabetes, hypertension, obesity, asthma and sleep apnea). A finding of particularized susceptibility in this case would comport with these holdings, as Defendant suffers from asthma, obesity, severe Cannabis Use Disorder and moderate Alcohol Abuse Disorder — all of which the CDC has identified as COVID-19 risk factors. (Def.'s Mot. at 10.)

Although courts have held that defendants suffering from chronic conditions cannot establish particularized susceptibility if their conditions are manageable in prison, that exception does not apply here. *See, e.g.*, *United States v. Saffore*, 2021 WL 1936804, at *2 (E.D. Va. May 13, 2021) (holding that a defendant with obesity, high blood pressure and asthma failed to establish particularized susceptibility because she received regular medical care while incarcerated). Since her sentence began on April 30, 2021, Defendant's asthma has worsened; she has had to renew her medications more frequently, was prescribed additional medication and was also referred to general radiology for chest reviews. (Def.'s Mot. at 7-8.) Accordingly, the Court finds that Defendant has established a particularized susceptibility to COVID-19.

Defendant, however, fails to demonstrate a particularized risk of contracting the disease. As of November 22, 2021, FCI Tallahassee reported no active cases of COVID-19 among its

inmate population and staff. *See COVID-19 Coronavirus*, Fed. Bureau of Prisons (showing updated figures on the number of inmates and prison staff who have tested positive for COVID-19).[3] Further, just two COVID-19-related deaths have occurred among inmates and staff, and 432 inmates and 62 staff members have recovered from the virus. *Id.* The Government also states that the BOP continues to provide facial coverings, sanitize common areas, enforce quarantine and isolation periods, limit movement, and conduct COVID-19 screening in all of its facilities as part of its modified operations plan. (Gov't Resp. at 4-7.) The BOP has also been distributing COVID-19 vaccines within its facilities; at FCI Tallahassee specifically, 113 inmates and 812 staff members have been fully vaccinated. *See COVID-19 Coronavirus*, Fed. Bureau of Prisons (showing updated figures on BOP vaccine rates).[4] Given the low number of active cases of COVID-19 among the inmates at FCI Tallahassee, the precautions that the facility continues to implement, and the widespread availability and effectiveness[5] of COVID-19 vaccines, the Court cannot conclude that Defendant has established a particularized risk of contracting COVID-19.

---

[3]   Available at https://www.bop.gov/coronavirus/ (last visited Nov. 22, 2021) (under "COVID-19 Cases," click "Full breakdown and additional details")

[4]   Available at https://www.bop.gov/coronavirus/ (last visited November 22, 2021) (under "COVID-19 Vaccine Implementation," click "Learn more about vaccinations and view individual facility stats"). In fact, these statistics may underrepresent the number of staff members who have been vaccinated at FCI Tallahassee, because they do not reflect the number of staff members who received their vaccines in the community. *COVID-19 Coronavirus: COVID-19 Vaccine Implementation, supra.*

[5]   Research shows that COVID-19 vaccines "are effective at preventing COVID-19," both in clinical trial settings and in real world conditions. *Effectiveness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness.html (May 10, 2021). The Moderna vaccine specifically has been shown to be 94.1% effective in preventing COVID-19 disease. *See Moderna COVID-19 Vaccine Frequently Asked Questions*, FDA, https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine-frequently-asked-questions (Oct. 4, 2021).

Moreover, according to the Government, Defendant refused the Moderna COVID-19 vaccine when FCI Tallahassee personnel offered it to her on June 28, 2021.  (Gov't Resp. at 8.) This Court has held that it will not find a defendant "to be at a particularized risk of contracting COVID-19 when he has placed himself in the position to be more at risk.  Rather, an inmate must show that he remains at a particularized risk of contracting COVID-19 despite taking the reasonable precautions afforded to him by the BOP." *Feiling II*, 2020 WL 5047064, at *7. Because Defendant declined to be vaccinated, she has made no such showing.  Indeed, this Court and others have found that no extraordinary and compelling reason for early release exists where a defendant refuses the vaccine. *See, e.g.*, *United States v. Shaw*, 2021 WL 3007266, at *3 (W.D. Va. July 15, 2021) (finding that although a defendant who declined the vaccine "ha[d] the right to refuse medical treatment due to concerns about its efficacy and safety, the refusal to take preventive measures addressing the concern at the heart of his motion [was] not consistent with a sentence reduction"); *United States v. Muse*, 2021 WL 2346021, at *1-2 (W.D. Va. June 8, 2021) (finding that the defendant did not demonstrate particularized susceptibility, because he refused the COVID-19 vaccine); *see also United States v. Clayton*, 2021 WL 2689838, at *2-3 (E.D. Va. June 30, 2021) (finding that typically, a defendant's refusal to take the COVID-19 vaccine would prevent him from establishing an extraordinary or compelling reason for compassionate release, but because the defendant was also taking medications that compromised his immune system, the defendant showed particularized susceptibility despite declining the vaccine).

Moreover, the fact that Defendant "already contracted and — thankfully — recovered from COVID-19" weighs against her release. *United States v. Nabaya*, 2021 WL 54361, at *5 (E.D. Va. Jan. 6, 2021).  Defendant tested positive for COVID-19 on April 30, 2021, and FCI Tallahassee thereafter placed Defendant in isolation for over two weeks and screened her daily.

13

(Gov't Resp. at 8, 12.)  Defendant initially experienced body aches, fatigue and a cough, but medical personnel observed her to be asymptomatic after the first two days of isolation.  (Gov't Resp. at 12.)  Since then, Defendant has not reported any COVID-19-related symptoms.  (Gov't Resp. at 12.)  Defendant's full recovery from the virus while in BOP's custody suggests that BOP is, in fact, capable of managing the treatment of inmates who contract COVID-19, including Defendant.  *See, e.g.*, *United States v. Brown*, 2021 WL 2210864, at *4 (W.D.N.C. June 1, 2021) ("Indeed, the fact that Defendant appears to have recovered from the virus without any serious complications illustrates that BOP has successfully managed his treatment to date." (citations omitted)); *United States v. Ferguson*, 2020 WL 5300874, at *5 (W.D.N.C. Sept. 4, 2020) ("The fact that the medical staff at FMC Lexington were able to successfully treat Defendant for COVID-19 . . . serves as the best evidence that they are well-suited to treat him again even if it is possible that he could get re-infected.").

Even if Defendant could establish a particularized risk of contracting COVID-19, she fails to show how her release to home confinement presents a viable alternative sentence, particularly if she continues to refuse the vaccine.  Were she to resume working in the healthcare field as she hopes to do, Defendant would likely face increased chances of both coming into contact with and spreading the virus,[6] particularly to her mother and children, with whom she plans to live.  (Def.'s Mot. at 24.)  Given that "Defendant's release on home confinement

---

[6]     Healthcare personnel face a higher risk of exposure to COVID-19 at work than the general population. *See, e.g.*, Samantha Artiga et al., *COVID-19 Risks and Impacts Among Health Care Workers by Race/Ethnicity*, Kaiser Family Found., https://www.kff.org/racial-equity-and-health-policy/issue-brief/covid-19-risks-impacts-health-care-workers-race-ethnicity/ (Nov. 11, 2021) ("Research suggests that health care workers face increased risks of coronavirus exposure and infection, with certain health care workers facing particularly high risks that disproportionately affect people of color.")

presents its own risks to Defendant's health, the health of h[er] family and public safety," this factor also weighs against release. *Feiling I*, 453 F. Supp. 3d at 841.

Finally, Defendant fails to demonstrate how her release will significantly reduce her likelihood of contracting COVID-19. Currently, 53% of inmates at FCI Tallahassee are fully vaccinated, and there are no active cases of COVID-19 among the inmate population. *COVID-19 Coronavirus*, Fed. Bureau of Prisons;[7] *FCI Tallahassee*, Fed. Bureau of Prisons.[8] In Newport News, where Defendant plans to live upon her release, 50.3% of the population is fully vaccinated. *COVID-19 Vaccine Summary*, Va. Dep't of Health.[9] Further, Newport News has reported an average of 138.3 new cases per 100,000 individuals within the last fourteen days. *COVID-19 Data in Virginia: Locality*, Va. Dep't of Health.[10] As such, COVID-19 presents an equal, if not greater, threat to Defendant should the Court release her on home confinement.

For these reasons, Defendant has not established that "extraordinary and compelling reasons" entitle her to compassionate release.

**B.     The Court Finds that the § 3553(a) Factors Do Not Support Defendant's Release.**

Even if an extraordinary and compelling reason entitled Defendant to compassionate release, the Court would still deny her compassionate release motion, because the Court further

---

[7]     Available at https://www.bop.gov/coronavirus/ (last visited November 22, 2021).

[8]     Available at https://www.bop.gov/locations/institutions/tal/ (last visited November 22, 2021) (reflecting that as of November 22, 2021, FCI Tallahassee housed 779 total inmates).

[9]     Available at https://www.vdh.virginia.gov/coronavirus/covid-19-in-virginia/covid-19-vaccine-summary/ (last visited November 22, 2021) (under "COVID-19 Vaccine Dashboards," select "Summary," under "Select Counts, Rates, or Percents," select "Percent of the Population," under "Select Vaccination Status," select "Fully Vaccinated," then navigate to "Vaccination Status - Percent of the Population" and mouse over Newport News on the map of Virginia).

[10]     Available at https://www.vdh.virginia.gov/coronavirus/covid-19-in-virginia/covid-19-in-virginia-locality/ (last visited November 22, 2021) (under "Select Measure," select "Cases," click "Newport News" in the table of localities and navigate to "Total Number of New Cases per 100,000 Population Within Last 14 Days").

finds that the § 3553(a) factors counsel against Defendant's release.  In support of her Motion, Defendant argues that she poses no danger to the community and is unlikely to recidivate. (Def.'s Mot. at 2.)  Defendant contends that her involvement in the underlying drug conspiracy stems from her relationship with Parks and that she "was not a high-level drug dealer."  (Def.'s Mot. at 23.)  Further, Defendant has no prior felonies and her criminal history consists only of traffic offenses and related failures to appear.  (Def.'s Mot. at 2.)  Defendant also argues that she has accepted responsibility for her actions and is prepared to resume working as a certified nursing assistant and continue raising her children.  (Def.'s Mot. at 23-24.)

In its Response, the Government contends that the § 3553(a) factors do not support Defendant's release.  First, the Government argues that the seriousness of Defendant's offense counsels against release.  (Gov't Resp. at 20.)  In contrast to Defendant's own characterization of her involvement in the underlying offense, the Government asserts that Defendant was not merely a passive participant; rather, she facilitated drug transactions on behalf of the trafficking ring's leader while he was incarcerated, and even after his release, she continued to facilitate the group's endeavors.  (Gov't Resp. at 21.)  The Government further contends that, because Defendant already received a lenient sentence of forty-two months — below the advisory minimum of forty-six months — her release after only a few months would undermine respect for the law.  (Gov't Resp. at 21.)  Finally, the Government argues that Defendant has exhibited a pattern of noncompliance with the law, which further weighs against release.  (Gov't Resp. at 22.)  During the time between her arrest and guilty plea, Defendant tested positive for marijuana and failed to appear for court-ordered urinalysis testing on two occasions.  (Gov't Resp. at 22-23.)  These failures to appear, the Government asserts, are consistent with Defendant's criminal

history, as she was convicted of either failing to appear or being found in contempt on three occasions following her ten traffic-related convictions.  (Gov't Resp. at 23.)

The Court agrees with the Government and finds that the § 3553(a) factors do not support Defendant's compassionate release.  First, Defendant's instant offense is serious.  Defendant served as a co-conspirator in a years-long drug operation.  (PSR ¶¶ 7-19.)  She also played a "prominent role" in the operation while co-conspirator Parks was in custody, and she "participat[ed] in and facilitat[ed] a number of controlled purchases" over the course of the conspiracy.  (PSR ¶¶ 7.3-7.4.)  Ultimately, the Court adopted the PSR, which found Defendant accountable for roughly 600 grams of cocaine, 70 grams of fentanyl and 10 grams of heroin, in addition to smaller amounts of other substances.  (PSR ¶ 19.)  Under the Sentencing Guidelines, Defendant's offenses merited a range of forty-six to fifty-seven months in custody.  (PSR ¶ 121.)  She was, however, sentenced to only forty-two months.  (Def.'s Mot. at 3.)  Of those forty-two months, Defendant has served nine, or roughly twenty percent of her sentence.  (Judgment at 2 (ECF No. 86) (sentencing Defendant to forty-two months on February 22, 2021.)  Granting her release now would undermine the law by inadequately reflecting the seriousness of Defendant's offense.

Second, though Defendant's past traffic-related offenses may be less serious than her instant offense, her conduct nonetheless exhibits a repeated disregard for the law.  Defendant has been convicted of contempt of court, failure to report for a jail sentence and failure to appear.  (PSR ¶¶ 41, 43, 51.)  Between her arrest and guilty plea in this case, Defendant also tested positive for marijuana, failed to report for a subsequent drug screen and failed to report a second time after being granted a grace period.  (PSR ¶ 99.)  This pattern of noncompliance weighs against Defendant's early release.

The Court appreciates Defendant's desire to continue raising her children and resume her career (Def.'s Mot. at 24), and the Court also acknowledges that Defendant has accepted responsibility and expressed remorse for her actions.  (PSR ¶ 24.)  However, given Defendant's lack of respect for the law — as evinced by her involvement in a serious drug conspiracy, in addition to her repeated failures to comply with court orders — early release is inappropriate here.  Ultimately, even if extraordinary and compelling reasons did exist for Defendant's compassionate release, the Court, in its discretion and after considering the relevant § 3553(a) factors and policy statements, finds that granting Defendant's Motion at this time would not adequately protect the public, promote respect for the law, deter Defendant and others from engaging in similar conduct or reflect the seriousness of Defendant's offense.  Accordingly, the Court DENIES Defendant's Motion for Compassionate Release.

## IV.   CONCLUSION

For the reasons set forth above, the Court hereby DENIES Defendant's Motion for Compassionate Release (ECF No. 103).  An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record, as well as the U.S. Probation Office.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Dated:  December 8, 2021